UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
BRUCE S. RAYNOR,                                       :
                                                       :
                       Plaintiff,                      :
                                                       :
            - against -                                :        09-CV-1374 (GBD)
                                                       :
JOHN W. WILHELM, SHERRI A. CHIESA, MARIA :              ECF CASE
ELENA DURAZO, D. TAYLOR, NICK                          :
WORHAUG, MIKE CASEY, HENRY TAMARIN,                    :        **SECOND AMENDED**
PETER WARD, JO MARIE AGRIESTI,                         :        **COMPLAINT**
GEOCONDA ARGUELLO-KLINE, WILLIAM                       :
BIGGERSTAFF, JOHN A. BOARDMAN, CAROL J. :
CARLSON, PAUL CLIFFORD, JOSEPH                         :
DAUGHERTY, THO THI DO, JIM DUPONT, JEF L.:
EATCHEL, ENRIQUE FERNANDEZ, ERIC GILL,                :
BILL GRANFIELD, HENRY CLAY GREEN, SR.,                 :
JACK GRIBBON, ROXIE HERBEKIAN, WARREN :
HEYMAN, KEVIN KLINE, KARL LECHOW,                      :
JANICE LOUX, C. ROBERT McDEVITT,                       :
LEONARD O'NEILL, STEPHEN PAPAGEORGE,                   :
SR., KEN PAULSEN, ROBERT PROTO, RICHARD :
SAWYER, JENNIFER SKURNIK, LEE STRIEB,                  :
MATTHEW WALKER and THOMAS WALSH,                       :
                                                       :
                       Defendants.                     :
------------------------------------------------------------------x

        Plaintiff Bruce S. Raynor, in his individual capacity, by his undersigned counsel,

as and for his second amended complaint against defendants, in their official capacities as

officers of UNITE HERE and in their individual capacities, alleges as follows:

## NATURE OF THE ACTION

        1.    Plaintiff Bruce S. Raynor, the General President of UNITE HERE, an

international labor organization ("UNITE HERE" or the "Union"), brings this action for a

declaratory judgment, injunctive relief and damages under Section 301(a) of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and Section 101(a) of the Labor-

Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a).  Pursuant to the

LMRA, plaintiff seeks to enforce the terms of the UNITE HERE Constitution.  Pursuant to the

LMRDA, plaintiff seeks to remedy defendants' violation of the "bill of rights" applicable to all

union members.

    2.   Defendants together constitute the majority of the Union's General

Executive Board (the "GEB").  Defendants Wilhelm, Chiesa, Durazo, Taylor, Worhaug, Casey,

Tamarin and Ward together constitute the majority of the Union's Executive Committee, which

acts for the GEB between GEB meetings.  Defendants have caused both the Executive

Committee and the GEB to take actions in excess of their constitutional authority, and in

derogation of the authority delegated by the Constitution to the Union's top two officers, the

General President and the President/Hospitality Industry, or to the General President alone.

Most recently, in an effort to (i) silence plaintiff, who has spoken out against defendants'

unconstitutional exercise of power and in favor of a consensual termination of the merger that

created UNITE HERE; (ii) intimidate other Union members into remaining silent on these and

other Union issues; and (iii) punish plaintiff for filing this lawsuit, defendants have caused the

GEB to purport to suspend plaintiff as General President of the Union.  By purporting to suspend

plaintiff, defendants have violated his statutory rights as a union member to freely express his

views on matters of interest to other union members, and to file a lawsuit in this or any Court.

    3.   UNITE HERE was formed in 2004 by the merger of UNITE, a labor

organization primarily representing workers in the textile, clothing, apparel, distribution, light

manufacturing and commercial laundry industries, and HERE, a labor organization primarily

representing workers in the hotel, restaurant, and gaming industries.  The combination was

intended to be a merger of equals.  To ensure that neither side dominated the new organization,

the UNITE HERE Constitution vested authority over a wide variety of critical matters in the General President – plaintiff Raynor, formerly of UNITE – and the President/Hospitality Industry – defendant Wilhelm, formerly of HERE – acting together.  The Constitution effectively gave each President a veto over the other in the exercise of their joint powers, thereby requiring them to reach consensus with respect to the matters entrusted to them together, or else risk deadlock.

4.      Despite the clear intentions of the parties to the merger, and the clear allocation of authority set out in the Constitution, Wilhelm, acting together with and on behalf of a faction comprised of former-HERE officials, is now seeking to take control of the Union, and thereby to take control of the Union's financial resources, the majority of which were and are contributed by former UNITE-affiliated organizations including, in particular, the Amalgamated Bank, the only union-owned bank in the United States.

5.      As part of their effort to seize control, Wilhelm and the other defendants caused first the Union's Executive Committee, and then the GEB,  to take a series of actions that those bodies lack the constitutional authority to take.  On a number of important matters over which authority rests with the General President and the President/Hospitality Industry (together, the "Presidents"), acting together, the Presidents do not agree or have not yet fully addressed the matter.  At a December 2008 meeting of the Executive Committee, defendants, breaking with all precedent, took the position that, in these circumstances, the Executive Committee can bypass the Presidents and make the decisions itself.  At a series of February, March, and April 2009 GEB meetings, defendants went even further, taking the position that, despite the careful allocation of power in the Constitution, the GEB can, in essence, force the Union to do whatever it wants.

3

6.      The Constitution is expressly otherwise.  With respect to all significant matters, the Constitution clearly states who has the authority to act – the General President, the General President and the President/Hospitality Industry together, the GEB, or some other officer or entity.  On those issues as to which the allocation of authority is solely to the Presidents, neither the GEB nor, *a fortiori*, the Executive Committee which, as noted, stands in for the GEB between its meetings, has any right to act in lieu of the Presidents.  On those issues, the Constitution requires a consensus between the Presidents and does not permit a faction of the Executive Committee to seize operational control of the Union.

7.      Improperly asserting the right to make any and all decisions, the Wilhelm faction has forced Executive Committee and GEB votes on such critical matters as the Union's budget and its allocation of resources, its organizing campaigns, the imposition of trusteeships over major Union affiliates, relations between Union locals and joint boards, the creation and staffing of Union committees, the revocation of the charters of joint boards, and Union litigation, all matters for which the Presidents have clear constitutional authority.  Through these unconstitutional votes, the Wilhelm faction seeks improperly to gain financial and operational control over UNITE HERE.

8.      Since December 2008, plaintiff has opposed defendants' unconstitutional usurpation of power, and he has spoken out, both at GEB meetings and in communications with Union members, against defendants' actions.  On January 22, 2009, plaintiff filed suit in the United States District Court for the Eastern District of New York seeking to enjoin defendants' unconstitutional conduct.  (That action was voluntarily dismissed and a similar action filed in the Southern District of New York where another action arising out of the conflict within UNITE HERE was pending).

4

9.    As defendants' power grab destroyed the trust and working relationship between the former-HERE and former-UNITE sides of the Union, plaintiff spoke out forcefully for a consensual termination of the merger that created UNITE HERE.  That plea was rejected by defendants, and in early March 2009, many joint boards and local unions disaffiliated from UNITE HERE and formed a new union, Workers United.   Since the disaffiliation, plaintiff has continued to publicly advocate a consensual termination of the merger and a negotiated resolution of all issues, including the division of assets, between UNITE HERE and the joint boards and locals that have left the Union.

10.    To silence plaintiff, to intimidate other Union members who might otherwise speak out in opposition to defendants, and in retaliation for plaintiff's commencement of this litigation, defendants have now caused the GEB to purport to suspend plaintiff as General President of the Union.  At an April 21, 2009 meeting, defendants caused the GEB to vote to suspend plaintiff, but defendants did not attempt to implement the suspension, expressly delegating to Wilhelm the authority to decide if and when to follow through on the suspension vote.  However, on May 14, 2009, defendants went forward with the purported suspension.  On that date, Wilhelm wrote to plaintiff that "[a]s of today, you are suspended from office as General President of UNITE HERE . . . ."

11.    The GEB's purported suspension of plaintiff violates the Constitution, which expressly provides that only the two Presidents, acting together, can suspend a Union officer.  In addition, the purported suspension violates plaintiff's statutory right to free speech with respect to Union affairs, and his right to file a lawsuit without retaliation against him by those in control of the Union.

5

12.     By this action, plaintiff seeks a declaration that the actions of the defendants violate the Constitution of UNITE HERE, a declaration that the Executive Committee and GEB votes taken as a result of those actions are null and void and of no force or effect, and injunctive relief barring defendants from causing or purporting to cause either the Executive Committee or the GEB to act in excess of its constitutional authority.  In addition, plaintiff seeks an award of compensatory damages, punitive damages, and attorney's fees to redress defendants' violation of his statutory rights.

## THE PARTIES

13.     Plaintiff Bruce S. Raynor is the General President of UNITE HERE and a member of the Union's Executive Committee and GEB.

14.     Defendant John Wilhelm is the President/Hospitality Industry of UNITE HERE and a member of the Union's Executive Committee and GEB.

15.     Defendants Sherri A. Chiesa, Maria Elena Durazo, D. Taylor, Nick Worhaug, Mike Casey, Henry Tamarin and Peter Ward are Executive Vice-Presidents of UNITE HERE and members of the Union's Executive Committee and GEB.

16.     Defendants Jo Marie Agriesti, Geoconda Arguello-Kline, William Biggerstaff, John Boardman, Carol J. Carlson, Paul Clifford, Joseph Daugherty, Tho Thi Do, Jim Dupont, Jef L. Eatchel, Enrique Fernandez, Eric Gill, Bill Granfield, Henry Clay Green, Sr., Jack Gribbon, Roxie Herbekian, Warren Heyman, Kevin Kline, Karl Lechow, Janice Loux, C. Robert McDevitt, Leonard O'Neill, Stephen Papageorge, Sr., Ken Paulsen, Robert Proto, Richard Sawyer, Jennifer Skurnik, Lee Strieb, Matthew Walker, and Thomas Walsh are Vice-Presidents of UNITE HERE and members of the Union's GEB.

6

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to Section 301(a) of the LMRA, 29 U.S.C. § 185, and Section 102 of the LMRDA, 29 U.S.C. § 412. UNITE HERE is an international labor organization, with many local union affiliates, representing employees in industries affecting commerce within the meaning of 29 U.S.C. § 152. Plaintiff and defendants are members and officers of UNITE HERE.

18.     Venue lies in this district because duly authorized officers and agents of UNITE HERE are engaged in this district in representing employee members of the Union, plaintiff maintains his office in this district, the Union maintains its principal office in this district, and certain acts giving rise to plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### UNITE and HERE

19.     The International Ladies' Garment Workers' Union ("ILGWU") was formed in 1900 to address the sweatshop conditions prevalent in the manufacture of women's clothing – conditions epitomized by the infamous 1911 Triangle Shirtwaist Factory fire in New York City that killed 146 women. The Amalgamated Clothing Workers of America ("ACWA") was founded in 1914 to organize workers in the men's clothing industry. In addition to seeking improved wages, hours and working conditions, ACWA pioneered the creation of social support systems for working people. The low-cost cooperative apartment houses ACWA built in New York, known as the Amalgamated Houses, still stand, and the Amalgamated Bank, founded in 1923 to offer free checking and other services to working people, still operates today.

20.     The Textile Workers Union of America ("TWUA") was founded by southern textile workers in 1939. In 1976, ACWA and the TWUA merged to form the

Amalgamated Clothing and Textile Workers Union ("ACTWU"), and in 1995, ACTWU, and ILGWU combined to form the Union of Needletrades, Industrial and Textile Employees (UNITE). The Laundry and Dry Cleaning International Union merged into UNITE in 2002.

21.     The Hotel Employees & Restaurant Employees International Union (HERE) was founded in 1891. For over a century, HERE has organized workers in hotels, bars, and restaurants and, in more recent years, in the casino industry. HERE also successfully organized workers at Yale University, winning a ten week strike in 1984.

**Background to the Merger**

22.     Plaintiff Bruce Raynor joined TWUA in 1973. He participated in many organizing drives among southern textile workers, including the J.P. Stevens campaign of the late 1970s. He became an Executive Vice-President of ACTWU in 1993 and an Executive Vice-President of UNITE at its founding convention in 1995. Plaintiff was elected Secretary Treasurer of UNITE in 1999, and President in 2001. As well as UNITE President, plaintiff served as Chairman of the Board of the Amalgamated Life Insurance Company and Chairman of the Amalgamated Bank.

23.     Defendant John W. Wilhelm joined HERE in 1969. He led many city-wide hotel industry negotiations and, in the early 1980s, led the organization of clerical and technical employees at Yale University. Wilhelm became the President of HERE in 1998.

24.     During the summer of 2003, UNITE provided critical assistance to HERE in negotiating a contract for employees at Yale University. In the fall of 2003, Wilhelm approached plaintiff about the possibility of merging the two unions.

25.     At that time, HERE was in perilous financial condition. Although it had approximately 200,000 members, the economic downturn that followed the 9/11 attacks had hit

8

the hospitality industry particularly hard and, as a result, HERE's revenues from union dues had declined. In addition, the union had little saved cash and few investments, and many of its pension and health benefit funds were underfunded.

26.    In contrast to HERE, UNITE's financial situation was relatively strong. In addition to cash derived from membership dues, UNITE received substantial income from the Amalgamated Bank, which was wholly owned by the international union and its affiliates. UNITE also owned two buildings in New York City and one in New Jersey and received rental income from unaffiliated tenants. In total, UNITE had about $300 million in assets, approximately ten times HERE's resources.

27.    A merger was attractive to HERE because it would give HERE access to the financial resources it needed to grow. Advocating the merger to a special HERE convention, Wilhelm told delegates that HERE needed "far greater resources, much more money" to continue organizing successfully. As for UNITE, he explained, "they've got a great deal more money than we do."

28.    A merger was also attractive to UNITE because the industries in which it had historically operated were shrinking in the United States. As clothing manufacturing jobs moved overseas, UNITE, which had approximately 150,000 members, faced a potentially declining membership base.

29.    Both unions approved a merger at special conventions, and UNITE HERE was created at a Chicago convention held on July 9, 2004.

**The UNITE HERE Constitution**

30.    Plaintiff and Wilhelm met personally, eight or nine times, to negotiate the terms of the merger and, in particular, to work out the power-sharing arrangements between the

9

two unions and their leaders. They agreed that plaintiff would be the first among equals; he

would become the chief executive officer of the union and would hold the title of General

President (generally the title of the principal officer in an international union). To emphasize and

effectuate their understanding that the combination would be a "merger of equals," rather than

the acquisition of one union by the other, plaintiff and Wilhelm made two other important

agreements. First, Wilhelm was also given a title including the word "president" –

President/Hospitality Industry. Second, and most important, they agreed that authority over most

critical Union functions would be vested in the two Presidents, acting jointly. While certain

tasks would be delegated to the General President alone, and others to various officers and

administrative bodies, neither former-UNITE officials nor former-HERE officials would

dominate the new Union because, for the most part, only the two Presidents acting together could

exercise meaningful power over key Union functions and operations, including its budget,

organizing activities, and supervision of affiliates, when necessary, through a trusteeship.

31.    This structure addressed the concerns of both sides. It assured HERE that,

even though plaintiff would be General President, major decisions would require the agreement

of Wilhelm, the former leader of HERE. It assured UNITE that, even though HERE, which had

more members (and more vice-presidents) than UNITE, would have numerical superiority in the

new union and therefore numerical superiority on the GEB and Executive Committee, major

decisions could not be taken without the agreement of plaintiff, the former leader of UNITE.

32.    Based on his age and deteriorating health, Wilhelm told plaintiff and

others that he intended to retire after two or three years. They hoped and assumed that, by that

point, the two organizations would be fully integrated, and they therefore provided that after

either of them left the Union, the other would become President of the Union, the position of

10

President/Hospitality Industry would be abolished, and the powers of the General President and

President/Hospitality Industry would be consolidated in the office of the President.  In the

interim, however, to ensure equality, and to guarantee that neither side could dominate the other,

Plaintiff and Wilhelm agreed that action on virtually every major Union decision would require

their mutual consent.

33.     Plaintiff and Wilhelm agreed to set up two bodies within the new Union:

a General Executive Board, comprised of all the Union's international officers, that would meet

twice a year, and an Executive Committee, comprised of a subset of the GEB members, that

could act between GEB meetings.  While certain specific tasks would be delegated to the GEB

and Executive Committee, their primary function – consistent with existing practice at both

UNITE and HERE – would be to advise the Presidents.  Because neither the GEB nor the

Executive Committee would hold decision-making power over the many critical matters

entrusted to the Presidents, no attempt was made to equalize the number of former-UNITE and

former-HERE members on either body.

34.     While plaintiff and Wilhelm recognized that requiring the Presidents to

agree on major matters created the potential for gridlock if they disagreed, that was the

contemplated and intended consequence of the constitutional structure upon which they agreed.

The requirement of consensus between the Presidents allowed UNITE and HERE to merge

without either side fearing domination by the other.

35.     The agreements worked out between plaintiff and Wilhelm were codified

in the UNITE HERE constitution.  The Constitution explicitly lists dozens of matters as to which

power is vested in the Presidents, acting jointly.  To name only a few, the Constitution provides

that the Presidents, acting together, have authority to decide all questions concerning the

jurisdiction of the Union and its affiliates; authorize strikes and strike payments; participate in any and all collective bargaining negotiations; supervise and direct all organizing activities; set and approve the Union budget; hire and direct staff and fix their salaries; place affiliates under trusteeship or supervision; and suspend Union officers pending the hearing of charges against them. Various other matters are explicitly delegated to the General President alone.

36.     This constitutional structure of necessity left a limited and primarily advisory role for the GEB (and the Executive Committee when it acts between GEB meetings). It was clear that the GEB would have more former-HERE members than former-UNITE members, so the protection of the interests of the UNITE minority codified in the dual-President structure would have been wholly illusory if the GEB could act on its own when the Presidents disagreed. A constitutional arrangement that allowed the GEB to decide matters subject to the Presidents' authority anytime the Presidents disagreed would not have protected the minority but would have done just the opposite. It would have ensured that if the UNITE and HERE sides of the merged union disagreed, the HERE position would control in every case.

37.     Accordingly, in keeping with its primarily advisory role, the Constitution assigns the GEB generalized supervisory and review responsibilities. *See* Art. 3, § 3; Art 3, § 6(c). The Constitution also delegates a number of concrete tasks to the GEB, but it does *not*, except in one specific instance, allow the GEB to settle a disagreement between the Presidents: the Presidents are empowered to "determine any and all questions as to the application, interpretation or construction" of the Constitution, but the GEB "shall resolve any disagreement between them." Art 3, § 3.; *see also* Art 3, § 6(c)(i). In the absence of a disagreement over constitutional interpretation, the GEB lacks the power to decide for itself matters as to which the Presidents may disagree. In other words, if the constitutional delegation of authority to the

12

Presidents is clear – as it is with respect to initiating trusteeship proceedings, setting the annual budget, suspending Union officers, and a host of other matters – the GEB may not take for itself the powers vested in the Presidents.

38.     As discussed below, none of the issues as to which the Executive Committee and GEB – both controlled by the Wilhelm faction – have now purported to act involves any disagreement over the interpretation of the Constitution.  On the contrary, in each case, the Wilhelm faction has caused the Executive Committee to seize control of matters over which the Constitution expressly vests authority in the General President and the President/Hospitality Industry, acting together, or in the General President alone.

39.     In short, the Constitution creates a clear separation of powers, vesting much authority in the Presidents together, some in the General President alone, some in the GEB, and some in the Executive Committee.  By causing the Executive Committee and GEB to assert power in areas expressly within the sole authority of the Presidents, the Wilhelm faction has acted contrary to the express language and fundamental structure of the Constitution, and contrary to the spirit of the merger of equals.

**Defendants' Violations of the Constitution at the Executive Committee Meeting**

40.     Since the merger, Wilhelm and his former-HERE colleagues have achieved the financial benefit they sought from the merger.  Membership dues, Amalgamated Bank dividends, rental and other income has allowed UNITE HERE to spend approximately $50 million a year on organizing.  In addition, the Union provides millions of dollars in subsidies to its various affiliates.  The substantial majority of those subsidies have gone to affiliates that were formally associated with HERE.

13

41.     Nevertheless, Wilhelm and his supporters have acted, and continue to act, contrary to the letter of the Constitution and the spirit of the merger by seeking to undermine the power-sharing arrangement and to place Wilhelm and the other former-HERE officials in *de facto* control of the Union.

42.     They have done so, in part, by improperly seeking to expand the powers of the GEB and the Executive Committee (which have always had more former-HERE than former-UNITE members) in derogation of the powers vested in the Presidents under the Constitution. On information and belief, Wilhelm and his associates intended even before the merger to enhance the powers of the GEB and the Executive Committee beyond the limited authority granted to them by the UNITE HERE Constitution.  Shortly before the merger, HERE expanded the size of its General Executive Board so that, when the two unions combined their boards, the combined GEB would have a majority of former-HERE members.

43.     Wilhelm and the other former-HERE Executive Vice-Presidents acted decisively to seize control of Union affairs at a meeting of the Executive Committee held on December 17 and 18, 2008 in Long Island City, New York.  At that meeting, Wilhelm and his allies caused the Executive Committee to vote on a series of measures addressed to matters explicitly within the sole authority of the Presidents (or the General President) under the Constitution.  Wilhelm brought to the meeting a list of proposals, which he had not shared with plaintiff or the other former-UNITE Executive Committee members, and forced a vote on each. Without any support from any former-UNITE Committee member, the Wilhelm faction caused the Executive Committee to ratify each measure.

44.     Throughout the meeting, plaintiff and other former-UNITE members objected that the Executive Committee lacked authority to enact the measures Wilhelm

14

proposed, and they pointed out that neither the Executive Committee nor the GEB had ever acted on such matters in the past.  While the Presidents had disagreed before on matters entrusted to them, and had sought advice from the Executive Committee, all decisions on such matters had always been made by plaintiff and Wilhelm after resolving their differences.

45.    In response, Wilhelm and his allies argued that the GEB, and the Executive Committee between GEB meetings, have the authority to decide any and all matters as to which the Presidents do not agree.  The express language of the Constitution, all Union precedent, and the basic understanding of the parties to the merger are all to the contrary.  The GEB's authority to resolve a disagreement between the Presidents is limited to disputes over the interpretation of the Constitution.  None of the issues raised at the December 17 and 18 meeting involved a constitutional issue.  All turned on matters as to which the Constitution's allocation of authority is clear.  Moreover, as to some matters, Wilhelm and his allies caused the Executive Committee to act in the absence of any disagreement at all.  In those instances, the Presidents had not yet attempted to address the issue.

### The Wilhelm Faction's Proposals Passed by the Executive Committee

46.    In clear and unambiguous language, the Constitution gives the Presidents, and only the Presidents, authority to commence trusteeship hearings with respect to a Union affiliate.  The Constitution provides that a Trustee may take control of an affiliate when it is necessary "in the opinion of the Presidents."  (Art. 4, §1).  Further, "[t]he Trustee shall be appointed by the Presidents."  (Art 4, § 4).  The issues raised by a trusteeship are addressed at a hearing, and the Constitution explicitly states that "[t]he Presidents shall order a hearing," and that "[t]he Presidents shall appoint a member or members of UNITE HERE to conduct such hearing and make a report to the Presidents."  (Art 4, § 3).

15

47.     Despite this explicit grant of authority to the Presidents, at the December 17 and 18 meeting, the Wilhelm faction twice caused the Executive Committee to commence trusteeship hearings against affiliates formerly associated with UNITE. Wilhelm introduced a proposal for a trusteeship hearing with respect to the Amalgamated Northeast Joint Board, and another for a trusteeship hearing with respect to the New England Joint Board.

48.     With respect to the first proposal, one Committee member, Noel Beasley, objected that the proposal was unconstitutional, and plaintiff stated that only the Presidents, not the Executive Committee, could order a trusteeship proceeding or appoint a hearing officer. Another Committee member, Mark Fleischman added that the Executive Committee had never taken a vote on such a matter in the past. However, when the question was called, all of the former-HERE Committee members voted in favor. Plaintiff and the other former-UNITE members abstained based on their view that the Committee did not have the right to vote on the issue.

49.     The outcome was the same with respect to the second trusteeship proposal. Plaintiff objected that the Committee lacked the authority to order a trusteeship hearing, and also noted that the proposals were politically motivated and seemed intended to get at the assets of the affiliates involved. (The Wilhelm faction was insisting that the New England Joint Board assume $1.5 million in debt now held by a former-HERE Boston local and that the Amalgamated Northeast Joint Board give $2.5 million to a favored New York City local). The Wilhelm faction voted in favor of the trusteeship proposal and plaintiff and the other former-UNITE members abstained.

50.     Although the Constitution specifies that the Presidents shall appoint the hearing officer if a trusteeship proceeding is commenced, the two Wilhelm proposals also

dictated who would conduct the hearing.  Wilhelm proposed – and the Wilhelm faction voted –
that defendant Warren Heyman would conduct the hearing in the Amalgamated Northeast Joint
Board trusteeship, and that defendant Peter Ward would conduct the hearing in the New England
Joint Board matter.

> 51.  Article 3, § 3(a)(v) of the Constitution provides that "[t]he Presidents shall
jointly have the right to . . . supervise and direct organizing activities."  Nevertheless, Wilhelm
introduced a resolution that "growth agreements" with employers could not become effective
until approved by the Executive Committee.  Growth agreements between a union and an
employer permit the union to expand its membership without a contested election.  Plaintiff
objected that the Constitution gave the Presidents authority over organizing and that the
Executive Committee lacked the power to pass the resolution.  Defendant Ward, rather than
dispute the Constitutional point, stated that the Constitution was "a disgrace" and "an
embarrassment" to the Union, and that the power to enter into growth agreements should not
have been entrusted to the Presidents.  Wilhelm agreed, saying that the Constitution was a
'terrible mistake."  All members of the Wilhelm faction voted in favor of the proposal and
plaintiff and the other former-UNITE Committee members again abstained to register their
objection that the Committee did not have the authority to vote on the question.

> 52.  Wilhelm also proposed that the duties of defendant Jim Dupont, Director
of the Union's Laundry and Food Service Division, be immediately restored.  When plaintiff
objected that the Constitution gave the Presidents authority over organizing, Wilhelm stated that
the Constitution gave the Executive Committee the power to resolve differences over the
Constitution, but he did not articulate any constitutional issue involved.  The proposal was

passed with the support of the Wilhelm faction and over the abstentions of plaintiff and the other former-UNITE Committee members..

53.     The Constitution explicitly gives the Presidents the joint authority to hire outside personnel, including professionals, needed to help with administering Union affairs. (Art. 3, § 3(a)(ix)). Despite this provision, Wilhelm proposed that the Executive Committee vote to retain Convention Services Unlimited to assist with the production of the Union's 2009 convention. Plaintiff objected that giving this contracting authority to the Executive Committee would amend the Constitution, but the proposal was nevertheless passed by the Wilhelm faction over the abstentions of plaintiff and the other former-UNITE members.

54.     The Constitution vests all authority over the Union's budget either with the Presidents jointly or with the General President alone. Article 3, § 3(a)(vi) provides that the "Presidents jointly shall have the right to . . . set and approve the annual budget for the International Union." Day to day authority is vested in the General President, who may "supervise and direct the administrative, operational and budgetary functions of the International Union." Article 3, § 3(b)(iv). Despite these provisions, Wilhelm introduced a package of "Budget Steps," and insisted that the Executive Committee enact them. These steps included, *inter alia*, eliminating the Communications Department and the International Affairs Department; eliminating the Legal Department except for the General Counsel; eliminating the Audit Department; freezing each Division's 2009 budget, and reducing it by any amounts any Division was over-budget in 2008; reducing the per capita dues paid to the International Union by $3.00; charging affiliates with space in the headquarters building a market rent; and eliminating International Union subsidies for affiliate staff not directly involved in organizing.

55.     After Wilhelm introduced these budget proposals, plaintiff stated that only the Presidents, not the Executive Committee, had authority to make budgets.  Wilhelm reiterated the view that, if the Presidents did not agree, the GEB (or Executive Committee between meetings) could act itself.  That simply misstates what the Constitution provides.  The GEB's power to resolve a disagreement between the Presidents is limited to matters of constitutional application, interpretation, or construction.  Moreover, plaintiff and Wilhelm had not discussed these budget proposals, let alone reached an impasse.  The Wilhelm faction voted to enact all of the "Budget Steps," and plaintiff and the other former-UNITE Committee members abstained.

56.     The Constitution provides that the General President shall appoint any committees of the GEB (Art. 3, § 3(b)(iii)), and that he shall be a member of all Union committees (Art. 3, § 3(b)(i)).  Despite these provisions, Wilhelm proposed the creation of a committee consisting solely of defendant Ward (as Chair), defendant Taylor, and Committee member Mark Fleischman to evaluate the best use of the Union's headquarters building in New York City.  Plaintiff objected that this usurped his constitutional authority, but the Wilhelm faction voted in favor of the proposal.  Plaintiff and the other former-UNITE members abstained.

57.     In an ironic reliance on authority vested in the Presidents jointly – authority he disregarded repeatedly at the December 17 and 18 meeting – Wilhelm noted that only the Presidents can terminate a UNITE HERE employee.  (Art. 3, § 3(a)(vii)).  He then proposed that if either President violated this rule, he would be brought up on charges before defendant Ward.  This proposal, however, was itself unconstitutional because the Constitution allows any member filing a charge against a President to do so before *any* Executive Vice-President.  (Art. 16, § 4(d)).  Plaintiff objected that the Executive Committee had no authority to amend the Constitution and require that all charges be filed with Ward.  The Wilhelm faction

19

(with Ward abstaining), nevertheless passed the proposal.  Plaintiff and the other former-UNITE

Committee members abstained, as they had throughout the meeting, in light of their view that the

Executive Committee lacked the authority to vote on the matters it was addressing.

### Defendants' Violations of the Constitution at the February 9-11, 2009 GEB Meeting

58.     In the wake of the Wilhelm faction's power grab at the Executive

Committee meeting, relations between former-UNITE members of the Union and former-HERE

members deteriorated rapidly, reaching the point where more than 20 Union Vice-Presidents

who were formerly UNITE officers publicly called for the termination of the merger.

59.     In this context, the Wilhelm faction used a February 9-11, 2009 GEB

meeting in Washington, D.C. to further cement its *de facto* takeover of the Union.  Following the

script from the Executive Committee meeting, defendants caused the GEB to pass a series of

resolutions with respect to matters over which the Constitution vests authority in the Presidents.

While defendants caused the GEB to withdraw the trusteeship proceedings that had been

mandated by the Executive Committee, they caused the GEB to confirm other actions taken by

the Executive Committee and to pass new resolutions in further derogation of the authority of the

Presidents.

### The Wilhelm Faction's Proposals Passed by the GEB

60.     The Constitution gives the two Presidents the authority to "adjust

differences between or within affiliates."  (Art. 3, § 3(a)(ii)).  Nevertheless, Wilhelm offered a

resolution resolving a dispute between Local 24 in Detroit and the Chicago and Midwest

Regional Joint Board.  The resolution ordered the Joint Board, *inter alia*, to relinquish any claim

to a Local 24 office, to withdraw all staff from Local 24's geographic area, and to cease

representing, collecting dues from, or claiming entitlement to a dues check-off with respect to,

any worker covered under a collective bargaining agreement to which Local 24 is a party.  As they had at the Executive Committee meeting, plaintiff and the other former-UNITE  officers abstained because the GEB lacks the authority to act on this matter.  Defendants caused the resolution to pass.

61.     Although, as discussed above, the Constitution provides that the General President shall appoint any committees of the GEB (Art. 3, § 3(b)(iii)), and that he shall be a member of all Union committees (Art. 3, § 3(b)(i)), the Wilhelm faction caused the GEB to reaffirm a resolution – over the abstentions of the former-UNITE members – creating a committee, excluding plaintiff, to evaluate the best use of the  Union's headquarters building.  Based on statements made by various members of the Wilhelm faction, defendants may well conclude that they should sell the building – an asset UNITE brought to the merger – to pay for the Wilhelm faction's preferred projects.  Given the current real estate market, such a sale would be grossly imprudent.

62.     Article 3, § 14 of the Constitution empowers the Presidents to appoint all committees for the Union convention.  Nevertheless, Wilhelm proposed a full slate of convention committees and the Wilhelm faction caused the GEB to approve them all.  This usurpation of presidential authority was particularly egregious because the Constitution specifically provides that the GEB may disapprove a convention committee selected by the Presidents only by a two-thirds vote.  The vote on the Wilhelm resolution was 38 for and 25 against, short of two-thirds approval, but the Wilhelm faction nevertheless construed the vote as passing the resolution.

63.     Although, as discussed above, the Constitution vests all authority over the Union's budget either in the Presidents jointly (Art. 3, § 3(a)(vi)) or in the General President alone (Art. 3, § 3(b)(iv), Wilhelm introduced a comprehensive 2009 budget proposal and caused

the GEB to pass it over the abstentions of the former-UNITE members.  The proposal was, in its entirety, an unconstitutional appropriation of presidential authority, but in addition, it contradicted a proposal the Wilhelm faction had forced through the Executive Committee. Before the Executive Committee, the Wilhelm faction reaffirmed that the only the Presidents together could fire International Union staff, and purported to set out a procedure for bringing charges against either President should he violate that rule.  The Wilhelm budget pushed through the GEB requires the termination of the entire headquarters communications staff and the entire legal staff except for the General Counsel.  These terminations were not approved by plaintiff, but the Wilhelm faction caused the GEB to mandate them nonetheless.

64.     The Constitution provides that only the Presidents may "make expenditures in connection with litigation on behalf of, or in defense of, UNITE HERE."  (Art. 3, § 3(a)(x)).  Nevertheless, Wilhelm proposed and defendants caused the GEB to approve a resolution that the Union pay defense costs in certain litigation against Wilhelm and others in the Wilhelm faction.

### The Fig Leaf Proposal

65.     Finally, to place a fig leaf over its naked power grab, the Wilhelm faction caused the GEB to pass a resolution purporting to confer on itself the authority to pass all of the other resolutions.  The proposal observes that the Constitution gives the GEB power to resolve presidential disagreements over the application, interpretation or construction of the Constitution and then states, in essence, that *anything* either President does or does not do, with respect to the budget, employment decisions, or anything else, must be, in some sense, an *application* of the Constitution, and thus subject to GEB authority if the Presidents disagree.  In other words, the resolution provides that, even for those matters as to which the constitutional grant of power to

22

the Presidents is clear, when the Presidents act on those matters they are applying the

Constitution, so *any* disagreement between them is always a constitutional disagreement.  With

that bit of specious logic, the Wilhelm faction purported to overturn the entire constitutional

structure and to destroy the carefully wrought balance of power on which the merger was

premised.

### Defendants' Violations of the Constitution at the February 26, 2009 GEB Meeting

66.     On February 23, 2009, acting under his constitutional authority to call

meetings of the GEB (Art. 3, § 3(b)(i)), plaintiff scheduled a meeting for March 13, 2009.  The

purpose of the meeting was to discuss the crisis in the union and to discuss the outcome of a

mediation effort lead by Joe Hansen, the President of the United Food and Commercial Workers.

67.     The next day, on February 24, Wilhelm sent out notice of a special

meeting of the GEB to be held two days later, on February 26.  Wilhelm did this despite the fact

that only the Presidents together can call a special meeting (Art. 3, § 6(a)).  Wilhelm never

consulted plaintiff about the time, place or agenda for the meeting, and he issued his notice

before providing plaintiff with a written request for a special meeting signed by 16 Vice-

Presidents, although that is also required.  That same day, plaintiff notified defendants that their

notice of a special GEB meeting was improper and that two days' notice was obviously

inadequate given that more than 60 Union officers had to attend from all over North America.

Plaintiff also reiterated that a meeting had already been called for March 13 and that it was

unnecessary and impractical to hold yet another meeting, especially after reasonable notice.

Nevertheless, defendants went forward with their improperly called meeting.

68.     At the rump meeting, defendants caused those present to approve

additional unconstitutional resolutions.  Only the Presidents, not the GEB, can retain and pay

counsel to commence or defend litigation (Art. 3, §§ 3(a)(ix) and (x)), but defendants caused the GEB to authorize various lawsuits and to retain and pay three different sets of lawyers. Only the Presidents can revoke the charter of a Union joint board (Art. 7, § 6), but defendants caused the GEB to authorize the revocation of the charter of any joint board that conducted a vote over disaffiliation from the international union.

### Defendants' Violations of the Constitution at the March 13, 2009 GEB Meeting

69.     In light of the Wilhelm faction's ongoing power grab, and the continued deterioration of the relationship between the former-UNITE and former-HERE sides of the Union, a large number of Union affiliates voted to disaffiliate from UNITE HERE. On or about March 6 and 7, 2009, 14 joint boards and dozens of local unions representing approximately 150,000 members voted to sever their ties to UNITE HERE.

70.     On March 13, 2009, the GEB met pursuant to the February 23, 2009 notice. At this meeting, defendants again caused the GEB to act unconstitutionally, passing a series of measures as to which the Constitution vests authority in the two Presidents acting jointly. Although, as explained above, only the Presidents can revoke the charter of a Union joint board, defendants caused the GEB to purport to revoke the charters of all the joint boards that voted to disaffiliate from UNITE HERE. Although, as explained above, only the Presidents can authorize the Union to initiate litigation and to retain and pay counsel, defendants caused the GEB to authorize retaining and paying counsel to sue various joint boards and former and current Union officers, including plaintiff.

71.     Despite the fact that the Constitution allows only the Presidents to initiate trusteeship hearings, the Executive Committee ordered such hearings with respect to two affiliates at its December 2008 meeting. At the February 9-11, 2009 meeting, the GEB rescinded

the order for these hearings.  At the March 13 meeting, however, the GEB, again disregarding presidential authority, sanctioned the initiation of trusteeship proceedings against all of the local unions affiliated with the joint boards that voted to disaffiliate from the Union, unless those locals continue to pay per capita dues to UNITE HERE.

72.     At the March 13 meeting, defendants also acted to strip from plaintiff and arrogate to themselves authority to receive and expend Union funds.  The Constitution gives the General President sole authority to "receive all monies due to UNITE HERE," to "deposit and invest UNITE HERE funds and withdraw such funds by check," and to "pay all bona fide expenses of UNITE HERE."  (Art. 3, § 3(b)(vi)(5-7).  Despite this clear allocation of authority to the General President, defendants caused the GEB to pass a resolution directing all Union affiliates to pay their per capita dues to a new bank account that defendants will establish and control.

73.     In sum, despite the fact that the Constitution expressly allocates power over most critical matters to the Presidents (or to the General President), defendants have purported to strip plaintiff of any power whatsoever.  At the Executive Committee and GEB meetings, and through the proposals passed in those meetings, defendants have taken the position that the GEB (and the Executive Committee between GEB meetings) can act on any matter as to which it chooses to act.  Rather than a merger of equals in which neither side could dominate the other, the Wilhelm faction has taken the position, and caused the Executive Committee and GEB to take the position, that the UNITE HERE combination was an acquisition of UNITE by HERE, as a result of which the former-HERE officers, through their numerical superiority on the GEB, can operate UNITE HERE and use its assets – most of which were created by UNITE – however they see fit.

**Plaintiff's Response to Defendants' Unconstitutional Power Grab and**
**Defendants' Purported Suspension of Plaintiff as General President of the Union**

74.     Beginning in December 2008 and continuing to the present, plaintiff has

spoken out against defendants' unconstitutional actions.  At each GEB meeting, plaintiff

denounced defendants' resolutions as an unconstitutional usurpation of authority vested in the

Presidents together, or in the General President alone.  In addition, in numerous communications

with other Union members, plaintiff has expressed the view that defendants have acted

unconstitutionally to seize operational control of the Union.  On January 22, 2009, plaintiff

commenced litigation seeking a declaration that defendants' actions have been unconstitutional,

and enjoining them from causing the GEB or Executive Committee to act in excess of its

constitutional authority.

75.     As a result, in part, of defendants' unconstitutional assumption of power,

plaintiff and many other Union leaders concluded that the merger of UNITE and HERE had been

a failure and should be terminated.  In GEB meetings, and in numerous communications with

other members, plaintiff vocally advocated a consensual and orderly unwinding of the merger.

Defendants rejected the idea of a consensual termination of the merger, and in March 2009, joint

boards and local unions representing over 150,000 Union members voted to disaffiliate from

UNITE HERE.  After the disaffiliation, plaintiff continued to speak out for a fair, orderly,

consensual resolution of all issues between UNITE HERE and the disaffiliated joint boards and

locals.

76.     Plaintiff has been outspoken in opposition to the views of defendants not

only with respect to defendants' unconstitutional usurpation of power and with respect to the

failure of the merger, but with respect to how the Union should spend its money, how it should

go about organizing, how it should relate to employers, where it should stand with respect to the

policies of Change to Win and the AFL-CIO, and many other matters of importance to the Union and its members.  To eliminate any voice of opposition within UNITE HERE, to intimidate all Union members so that they would not express views contrary to those of defendants, and to punish plaintiff for filing a lawsuit against them, defendants acted in April and May 2009 to suspend plaintiff from his elected office as General President.  Defendants' actions were part of a general campaign to suppress dissent among Union members that included, as discussed above, threatening any Union affiliate with the loss of its charter if it even conducted a vote on disaffiliation.  As part of the same campaign, defendants threatened affiliate leaders with personal liability if they conducted such votes.

77.     On April 2, 2009, defendant Janice Loux wrote to defendant Henry Tamarin presenting formal charges against plaintiff.  The charges themselves make clear that defendants were punishing plaintiff for expressing his views.  For example, one of the charges accuses plaintiff of "condoning and advocating secession."  Tellingly, virtually all of the documentary evidence attached to the Loux letter as justification for the charges consisted of plaintiff's written statements and statements to the press expressing his views on the Union's internal disputes.

78.     The same day that Loux wrote her letter, Tamarin wrote a memorandum to the GEB recommending that plaintiff be immediately suspended and asking other GEB members to fax ballots to him voting on whether or not to suspend plaintiff.  The GEB does not, however, have the constitutional authority to suspend the General President.  Under the Constitution, only the Presidents, acting together, can suspend a Union officer pending a hearing on charges.  Art. 16, § 6 states:  "Whenever in the opinion of *the Presidents*, charges preferred against any officer of the International Union or of an affiliate are of sufficient importance to warrant a temporary

suspension pending hearing, *the Presidents* shall have the right to suspend such officer pending the hearing of charges . . . ." (emphasis added).  (In addition, Tamarin's request for a fax poll of the GEB was itself unconstitutional.  Only the General President can authorize the GEB to act by poll, without a meeting.  (Art. 3, § 6(b)).

79.     Defendants took no overt action in response to the fax poll, but waited for an April 21, 2009 meeting of the GEB.  At that meeting, defendants passed yet further unconstitutional resolutions of the nature they had passed at the December, February, and March meetings.  They passed resolutions allowing a local to amend its by-laws, even though local by-laws must be approved by both Presidents.  (Art. 5, § 1).  They passed resolutions initiating trusteeship proceedings and retaining counsel, even though as explained above, those actions require the approval of both Presidents.  In addition, defendants caused the GEB to appoint Henry Tamarin as the hearing officer with respect to the charges proffered against plaintiff.  That too was unconstitutional.  The Constitution does not permit the GEB to appoint the hearing officer when a President is charged and it expressly prohibits "witnesses and anyone who might benefit personally and directly from the outcome of the proceedings" from conducting a hearing. Tamarin is a witness to all of the actions of the GEB alleged herein, and he is a defendant in this lawsuit.  Accordingly, he cannot act as the hearing officer as a matter of the express terms of the Constitution and as a matter of basic fairness.

80.     At the April 21 meeting, defendants also caused the GEB to vote to suspend plaintiff from office.  Doubtless aware that the Constitution does not permit the GEB to suspend the General President, the GEB voted to stay the execution of its own suspension vote, and it delegated to Wilhelm the authority to decide if and when to follow through on the suspension.

81.     Wilhelm purported to impose the suspension on May 14, 2009.  On that date, he wrote to plaintiff stating:

> As of today, you are suspended from office as General President of UNITE HERE pursuant to [the April 21, 2009] order.  You are relieved of all duties, responsibilities and powers during this suspension.  You may not take any property from the union and you must return all property in your possession.  You are barred from the union's offices, including those located at 275 Seventh Avenue, except for the purpose of returning the union's property in your possession . . . .

In this fashion, defendants added an unconstitutional suspension to the unconstitutional appointment of a hearing officer.  This conduct, together with the GEB's unrelenting hostility to plaintiff, make a fair trial on the charges initiated by defendant Loux impossible.

82.     As General President, plaintiff's responsibilities extend to virtually every area of the Union's activities.  He is responsible for presiding over the Union's convention, as well as meetings of the GEB and the Executive Committee; managing the Union's staff; acting as the Union's principal representative to Change to Win, the labor federation, and principal participant in cooperation meetings between Change to Win and the AFL-CIO; filing official reports with the federal government; receiving and disbursing Union funds; submitting financial reports to the convention, and performing many other important duties.  (*See* Art. 3, § 3(b)).  In addition, together with the President/Hospitality Industry, he is responsible for making decisions with respect to all critical Union matters – strikes, collective bargaining agreements, organizing, the budget, etc.  By its unconstitutional suspension order, defendants purport to prevent plaintiff from performing any of the functions of the office to which he was elected.

29

**First Claim for Relief**
**LMRA § 301**

83.     Plaintiff repeats the allegations set forth in paragraphs 1 to 82.

84.     By virtue of the foregoing, the defendants have violated, and breached their duties under, the UNITE HERE Constitution.  Through their conduct, they have caused the Executive Committee and GEB to act in excess of their constitutional authority, and in derogation of the constitutional authority of the Presidents and the General President.

85.     Unless enjoined from doing so, defendants will continue to violate the Constitution, they will continue to cause the Executive Committee and GEB to act in excess of their constitutional authority, and in derogation of the constitutional authority of the Presidents and the General President.

86.     Plaintiff and other Union members have been and will be injured because plaintiff has been and will continue to be prevented from exercising his constitutional authority and, as a result, the operations of the union have been and will continue to be adversely affected. Much of the Union's essential work, including, *inter alia*, dispute resolution with employers, planning and executing plans for future growth, planning and executing an appropriate budget, and addressing jurisdictional disputes with other unions has been and will continue to be halted or compromised.

87.     Plaintiff has no adequate remedy at law.

**Second Claim for Relief**
**LMRDA § 101**

88.     Plaintiff repeats the allegations set forth in paragraphs 1 to 87.

89.     To prevent plaintiff from speaking freely on matters of concern to Union members; to intimidate other Union members into remaining silent on such matters; to punish

plaintiff for speaking freely with respect to defendants' unconstitutional acts, the failure of the merger of UNITE and HERE, and other matters of concern to Union members; and to punish plaintiff for filing this lawsuit, defendants have purported to suspend plaintiff from the office of General President, to which he was elected.  Defendants have acted as part of a general campaign to suppress dissent within UNITE HERE that has included their unconstitutional usurpation of power, and their threats against affiliate leaders and other Union members.

90.     Plaintiff and all Union members have been and will continue to be injured by defendants' acts.  Plaintiff's exercise of his free speech rights has been impaired, and the willingness and ability of all Union members to exercise such rights has been chilled.  Union members have been deprived of any counterweight to the unilateral acts of defendants, they have been deprived of representation by the principal officer they elected to serve them, and they have been deprived of the guidance he was elected to give on a wide range of strategic and operational issues of vital importance to the Union.  Defendants' purported suspension has interfered, and will continue to interfere, with plaintiff's ability to perform the wide-ranging functions of his office, and Union members have been deprived of the services of the officer they elected to lead the Union.

91.     Defendants have acted maliciously, in knowing and deliberate disregard of plaintiff's rights under the law and under the UNITE HERE Constitution, and with a conscious intent to injure plaintiff and the Union members he represents.

WHEREFORE, plaintiff requests that this Court enter judgment:

(1)     On his First Claim for Relief,

31

(a)   declaring that defendants have violated the UNITE HERE Constitution by causing the Executive Committee and GEB to act on matters as to which the Presidents or the General President have sole authority;

(b)   declaring that the actions taken by the Executive Committee at its December 17 and 18, 2008 meeting, and by the GEB at its February 9-11, 2009, February 26, 2009, March 13, 2009, and April 21, 2009 meetings, and through the May 14, 2009 letter from John Wilhelm to Bruce Raynor, as described herein, are null and void and of no force or effect;

(c)   enjoining defendants, and all those acting in concert with them, from causing the Executive Committee or the GEB to act on any matter outside its constitutional authority and/or on any matter as to which the Presidents or the General President have sole authority including, without limitation, commencing any trusteeship proceeding; appointing a hearing officer for any trusteeship proceeding; directing the Union's organizing activities; employing or retaining personnel required to administer the affairs of the Union; enacting any budget for the Union or any constituent element of such budget; excluding the General President from any committee; establishing any convention committee; requiring that any charges filed against the General President or President/Hospitality Industry be filed with a specific Executive Vice-President; adjusting differences between or within Union affiliates; making any expenditures of International Union funds in connection with litigation on behalf of, or in defense of, UNITE HERE; revoking any affiliate's charter; establishing any bank account over which the General President does not have control for the purpose of receiving or expending funds

32

on behalf of the Union; appointing a hearing officer to hear charges against the General President; or suspending the General President;

(2)   On his Second Claim for Relief,

(a)   declaring that the purported suspension of plaintiff from the office of General President of UNITE HERE violated the bill of rights set forth in Section 101(a) of the LMRDA;

(b)   declaring that the purported suspension of plaintiff from the office of General President of UNITE HERE, as reflected in the April 21, 2009 resolution of the GEB and in the May 14, 2009 letter from John Wilhelm to Bruce Raynor, is null and void and of no force or effect;

(c)   enjoining defendants, and all those acting in concert with them, from taking any action to suspend or enforce a suspension of plaintiff from the office of General President of UNITE HERE;

(d)   awarding plaintiff compensatory damages in an amount to be proved at trial;

(e)   awarding plaintiff punitive damages in an amount to be determined at trial;

(3)   awarding plaintiff the costs and disbursements of this action including, to the extent warranted, reasonable attorneys' fees; and

(4)   awarding plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      May 21, 2009

FRIEDMAN KAPLAN SEILER & ADELMAN LLP

_____

Eric Seiler (eseiler@fklaw.com)
Robert D. Kaplan (rkaplan@fklaw.com)
1633 Broadway
New York, New York 10019
(212) 833-1100


TESSER, RYAN & ROCHMAN, LLP
Irwin Rochman (rochmanesq@nyc.rr.com)
509 Madison Avenue
New York, New York 10022
(212) 754-9000

*Attorneys for Plaintiff*